**KMART CORPORATION, Relator,**

v.

**COUNTY OF STEARNS, Respondent.**

No. A05–442.

Supreme Court of Minnesota.

Feb. 9, 2006.

Rehearing Denied March 27, 2006.

Thomas R. Wilhelmy, Laurie J. Miller, Fredrikson & Byron, Minneapolis, MN, for Relator.

Gerald W. Von Korff, Creig L. Andreasen, Rinke–Noonan, St. Cloud, MN, for Respondent.

John R. Kingrey, Minnesota County Attorneys Association, St. Paul, MN, for Amicus Curiae.

## OPINION

HANSON, Justice.

This property tax appeal raises two issues. The first is whether Minn.Stat. § 278.05, subd. 6(a) (2002),[1] known as the "60–day rule," requires a taxpayer to provide the county with information on tenant-paid real estate expenses (specifically property taxes, utilities, insurance, and maintenance and repair expenses) within 60 days of filing a chapter 278 petition. The tax court interpreted the statute to require production of this information, despite prior tax court decisions arguably to the contrary. The second issue is whether a taxpayer should be relieved of the sanction of dismissal of a chapter 278 petition because it relied on the tax court's prior erroneous interpretations of the 60–day rule. We affirm the tax court and deny relator's request for purely prospective application of our holding.

Relator Kmart Corporation leases retail property in Stearns County, Minnesota. Under the terms of the lease, Kmart is responsible for paying the property taxes.[2] In 2000, 2001, and 2002, Kmart filed timely petitions under chapter 278 of Minnesota Statutes challenging the Stearns County assessor's valuations of the property.

Chapter 278 provides "an adequate, speedy, and simple remedy for any taxpayer to have the validity of his claim, defense, or objections determined by the * * * court in matters where the taxpayer claims that his real estate has been partially, unfairly, or unequally assessed." *Cont'l Sales and Equip. Co. v. Town of Stuntz*, 257 N.W.2d 546, 548 (Minn.1977) (quoting *Land O'Lakes Dairy Co. v. Sebeka Village*, 225 Minn. 540, 548, 31 N.W.2d 660, 665 (1948)). Adjudication of a chapter 278 petition involves different procedures than those normally applicable under the rules of civil procedure. Minn. R. Civ. P. 81.01; Minn. R. Civ. P. app. A. One of these procedural differences is a disclosure requirement commonly known as the "60–day rule." Minn.Stat. § 278.05, subd. 6(a). It provides:

> Information, including income and expense figures, verified net rentable ar-

---

1. Section 278.05, subdivision 6(a), was amended in minor ways in 2003. Act of May 25, 2003, ch. 127, art. 2 § 19, 2003 Minn. Laws 731, 776. The 2002 version was applicable to the three property tax years (2000, 2001, and 2002) for which appeals in this case were taken.

2. This makes Kmart a proper party to file the chapter 278 petition. Minn.Stat. § 278.01, subd. 1 (2004).

eas, and anticipated income and expenses, for income-producing property must be provided to the county assessor within 60 days after the petition has been filed under this chapter. Failure to provide the information required in this paragraph shall result in the dismissal of the petition, unless the failure to provide it was due to the unavailability of the evidence at that time.

*Id.* The subject of this appeal is the requirement that the petitioner produce "expense figures" and "anticipated * * * expenses."

Within 60 days of filing each petition, Kmart provided Stearns County with a site drawing of the leased property and a copy of its lease. The lease indicates that Kmart is responsible for paying certain expenses including property taxes; insurance on common areas; costs of repairs, maintenance, and improvements; and all utilities (gas, water, sewage, telephone, electricity, etc.). Kmart did not provide Stearns County with statements that detailed or separated the amounts it paid for each of these expenses.[3]

Stearns County moved to dismiss all three petitions for failure to comply with the 60–day rule. Stearns County argued that the 60–day rule requires Kmart to produce information concerning the real estate expenses that Kmart was responsible for under the terms of the lease. Kmart argued that only owner-paid, and not tenant-paid expenses are required to be produced under the 60–day rule. Kmart also argued that the petitions should not be dismissed because Kmart's failure to provide tenant-paid expenses "was due to the unavailability of the information," within the meaning of the 60–day

rule. Kmart submitted an affidavit stating that Kmart does not maintain any records that "separately identify the operating expenses for the real estate of the subject property."

The tax court held that "[t]he plain language of the statute and the Minnesota Supreme Court's holding in *BFW* requires real estate expense information to be produced." *Kmart Corp. v. County of Stearns,* Nos. CX–00–404, CX–01–1465, C2–02–1387, 2005 WL 94810 at *3 (Minn. T.C. Jan. 4, 2005) (herein "*Stearns County I*") (referencing *BFW Co. v. County of Ramsey,* 566 N.W.2d 702 (Minn.1997)). The court acknowledged that Kmart is not required to produce expense figures for operating the business on the subject property but determined that Kmart is required to produce expense figures for operation of the real estate. *Id.* at *2. Further, the court held that Kmart's "unavailability" defense was not credible because the lease required Kmart to pay these expenses. *Id.* at *4.

Kmart moved for reconsideration and also argued that if its motion was denied, *Stearns County I* creates a new principle of law that should only be applied prospectively. The tax court denied the motion and further determined that its decision did not create a new principle of law that would warrant prospective application. *Kmart Corp. v. County of Stearns,* Nos. CX–00–404, CX–01–1465, C2–02–1387, 2005 WL 937620 at *1, 2 (Minn. T.C. March 3, 2005) (herein "*Stearns County II*"). On Kmart's petition, we issued a writ of certiorari to review the tax court orders.

■ We review a tax court decision "on the ground that the Tax Court was without

---

**3.** In 2001, Kmart provided Stearns County a "net profit report," which describes broad categories of expenses that may include some related to the operation of the real estate. Although absent from the record, Kmart says

it provided the same report in 2002. Kmart does not argue that the real estate expense figures in these reports satisfy the requirements of the 60–day rule. Thus we do not decide that issue.

jurisdiction, that the order of the Tax Court was not justified by the evidence or was not in conformity with law, or that the Tax Court committed any other error of law." Minn.Stat. § 271.10, subd. 1 (2004). Where the facts are undisputed, as they are here, we review conclusions of law, including the interpretation of statutes, de novo. *BFW Co. v. County of Ramsey*, 566 N.W.2d 702, 704 (Minn.1997).

## I.

■ We begin by considering the correct interpretation of the 60–day rule provided in section 278.05, subdivision 6(a). Kmart asks us to interpret the 60–day rule to distinguish between who pays the real estate expenses for rental property. Without arguing that tenant-paid real estate expenses are not relevant to the appraisal of the real estate, Kmart says the "well-settled" rule is that "the expenses called for by the 60–day Rule are the *owner's* expenses of operating the underlying real estate, and not those of a retail *tenant* whose business is operated at the subject property." (Emphasis added.) Kmart interprets the 60–day rule to only require from a tenant disclosure of income produced by the property in the form of rent.

■ We recognize that the tax court has stated, in a series of cases, that the 60–day rule does not require a tenant to produce information on tenant-paid real estate expenses. *See Kmart Corp. (Anoka) v. County of Anoka*, Nos. CX–01–2784, C5–02–2881, C8–03–4232, 2004 WL 612777 at *2 (Minn. T.C. March 4, 2004); *Kmart Corp. (Blaine) v. County of Anoka*, Nos. C1–00–2775, C1–01–2785, C2–02–2885, C1–03–4234, 2004 WL 612789 at *3 (Minn. T.C. March 4, 2004); *Kmart Corp. (Columbia Heights) v. County of Anoka*, No. C3–01–2786, slip op. at 6 (Minn. T.C. March 4, 2004); *Kmart Corp. v. County of Douglas*, No. C7–00–309, 2001 WL 40361 at *2 (Minn. T.C. Jan. 11, 2001) (herein "*Douglas County*"); *Kmart Corp. v.*

*County of St. Louis*, Nos. C1–00–600670, CX–00–600666, C3–00–600671, C8–00–600665, 2001 WL 40370 at *3 (Minn. T.C. Jan. 11, 2001) (herein "*St. Louis County*"). But this court is not bound by decisions of the tax court, especially in the area of statutory interpretation. *In re Estate of Abbott*, 213 Minn. 289, 296, 6 N.W.2d 466, 469 (1942).

The statute refers to "expense" without qualification. It does not limit the information to owner-paid expenses. In fact, the question of which party is responsible for these expenses under the lease is irrelevant to the purpose of the 60–day rule to facilitate a speedy, efficient remedy for the taxpayer. In other words, if the real estate related expenses for taxes, insurances, utilities, maintenance, and repair are required to be produced under the 60–day rule when paid by the owner, there is no logical reason why they are not similarly required to be produced when paid by the tenant. The 60–day rule focuses on the "expenses," not on which party has paid them.

Although our past decisions interpreting the 60–day rule deal only with the "income" component, they uniformly support a broad reading of the rule. Thus, in *BFW*, we held that:

> [T]he statute's text requires the petitioner to provide all information within its possession, even though the petitioner deems certain portions of that information to be incomplete or not fully accurate. In addition, we conclude that the statute clearly requires the petitioner to provide *any* of the required information within its possession on the date of the deadline. The unavailability of one type of evidence does not render unavailable other types of information within the possession of the petitioner.

*BFW*, 566 N.W.2d at 705.

Also, in *Kmart Corp. v. County of Becker*, we declined to limit the scope of the

information required under the 60–day rule. 639 N.W.2d 856 (Minn.2002). Kmart's lease in *Becker* involved a percent rent clause that increased its rent in the event that its income exceeded a specified amount. *Id.* at 858. We held that this contingency clause triggered a duty for Kmart to disclose its business income, even though this ultimately became irrelevant to the amount of rent paid because its income did not actually exceed the threshold amount. *Id.* at 860. After reviewing the purpose of the rule and its legislative history, we reaffirmed our policy of strictly enforcing the rule and leaving "the overall balancing of competing tax policy considerations to the legislative branch of government." *Id.* at 861. We adopted a broad standard of relevancy, stating: "[w]ithout this information, the assessor could not begin the valuation process." *Id.* This standard is consistent with the legislature's charge to "every assessor and board, in estimating and determining the value of lands for the purpose of taxation, to consider and give due weight to *every* element and factor affecting the market value thereof." Minn.Stat. § 273.12 (2004) (emphasis added).

Consistent with our past decisions, we interpret the 60–day rule to require production of expense information that is useful and relevant to the appraisal process. Because the undisputed facts of this case and the generally recognized principles of real estate appraisal make it clear that tenant-paid real estate expenses are useful and relevant to the appraisal process, we interpret the 60–day rule to require that they be produced within 60 days of the filing of a chapter 278 petition.[4]

The focus of a property tax appraisal is to determine the fair market value of the property to the owner (the landlord). *See* Minn.Stat. § 278.01, subd. 1 (2004). There are three recognized methods for conducting such an appraisal. *Montgomery Ward & Co. v. County of Hennepin*, 450 N.W.2d 299, 302 (Minn. 1990). The comparable sales method, or "market approach," uses sales data for comparable properties. *Id.* at 303. The cost approach seeks to determine the cost of "reproducing a substitute property with the same utility as the subject" property. *Id.* at 302–03. The income model derives the property value by capitalizing the net income that can be earned by the property. *Id.* at 303.

Lease expense information may not be relevant to the cost or comparable sales methods, but it is relevant to the income model. The affidavit of Dwight Dahlen, Stearns County's appraisal expert, explains why this is so. Dahlen states that the goal of the income model is to estimate the "potential gross rent, the rent that would be collected if the property were fully occupied at market rent." To determine market rent, the appraiser first examines the rents for comparable properties. In order to make that comparison valid, the appraiser adjusts for variations in the manner that the underlying leases allocate the operating expenses between the owner and the tenant by including all operating expenses by whomever paid. This enables the appraiser to compare "expenses reported for the subject property to expense information for comparable properties." Through this comparison, the appraiser attempts to determine how closely the contract rent for the subject

---

4. The dissent misconstrues our holding when it refers to the majority's "adoption of the tax court's new interpretation of Minn.Stat. § 298.05." Because we review the tax court's interpretation of the statute de novo, we do not defer to the tax court's interpretation but instead make our own interpretation.

property reflects the market rent as determined from the comparable properties. According to Dahlen, the contract rent for a building with very high operating expenses allocated to the tenant may be viewed differently than the contract rent for a building with very low operating expenses or where the expenses are allocated to the landlord. Kmart did not dispute Dahlen's explanation of the relevance of operating expenses to the use of the income model. That explanation is also consistent with the literature on the subject. Dahlen referred to the publication of the International Association of Assessing Officers, *Property Appraisal and Assessment Administration* (Joseph K. Eckert ed., 1990) (herein "IAAO"). That publication states that because the goal of the appraiser is to determine the potential gross income from the lease, it is important for the appraiser to evaluate leases of comparable properties. *Id.* at 253. The IAAO recognizes that rent may have been set lower than prevailing market conditions due to the various allocations of operating expenses for the real estate between the landlord and tenant. *Id.*[5]

In summary, tenant-paid real estate expenses are relevant to the process of appraising the value of rental property and the 60–day rule requires that they be provided to the county within 60 days of filing a chapter 278 petition. Because Kmart did not disclose any tenant-paid real estate expenses, the tax court correctly determined that Kmart violated the 60–day rule.[6]

## II.

We next turn to Kmart's argument that if we affirm the tax court's interpretation of the 60–day rule, we should only apply our holding prospectively because it would constitute a new principle of law and defeat strong reliance interests. We note at the outset that this argument can only apply to Kmart's 2001 and 2002 petitions because the tax court decisions stating that tenant-paid real estate expenses need not be provided under the 60–day rule were filed after the expiration of the 60–day disclosure deadline for its 2000 petition.

Kmart has not referred us to any recognized theory of law that would support its request that the tax court decision in this case (or our decision affirming it) should only be applied prospectively. Kmart relies on the purely prospective ruling doctrine that has, in limited circumstances, been applied to decisions of this court. We conclude that doctrine is not applicable to decisions of the tax court. Further, because Kmart's arguments are founded on a claim of reliance, we have also analyzed them under principles of equitable estoppel. We find those principles equally unavailing.

### A. Purely Prospective Ruling Doctrine

As a general rule this court's decisions are given retroactive effect. *State v. Baird,* 654 N.W.2d 105, 110 (Minn. 2002).[7] But this court has recognized "limited exceptions to the general rule" where

---

5. *See also* Appraisal Institute, *The Appraisal of Real Estate* 497, 501 (12th ed. 2001) ("To derive pertinent income and expense data, an appraiser investigates comparable sales and rentals of competitive income-producing properties of the same type in the same market. For investment properties, current and recent incomes are reviewed, and vacancy and collection losses and typical operating expenses are studied.").

6. Because Kmart did not disclose any expense information, we do not address what level of detail might be minimally necessary to satisfy the 60–day rule where partial information is provided.

7. As we noted in *Baird,* the terms "retroactive, nonretroactive, and prospective have been variously defined." 654 N.W.2d at 110 n. 5. We understand Kmart's request to be for purely prospective application of our deci-

"special circumstances" exist. *Id.* at 110–11. This purely prospective ruling doctrine requires that three factors be present:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *. Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." * * * Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Hoff v. Kempton,* 317 N.W.2d 361, 363 (Minn.1982) (quoting *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)). We have emphasized that this doctrine has been applied in "only very limited situations." *Turner v. IDS Fin. Servs., Inc.,* 471 N.W.2d 105, 108 (Minn.1991).

Kmart bases its request for a purely prospective ruling on a series of tax court decisions that said tenant-paid real estate expenses are not required to be produced under the 60–day rule. The first decision on this point was a 2001 order on a motion for reconsideration in another Kmart case. *Douglas County,* 2001 WL 40361. The tax court said:

> The value of the property, as determined under the income approach, requires capitalizing the value of the income stream from the property after the expenses that reduce the income stream are deducted. Since expenses that are paid by the tenant do not reduce the income to the landlord, those expenses are not relevant in calculating the value of the property.

*Id.* at *2. Although the court concluded that Kmart's failure to provide "tenant paid business expenses related to real estate" did not provide a basis to dismiss the petition, it dismissed the petition on other grounds. *Id.* at *3, 5. Thus the language concerning tenant-paid real estate expenses was not dispositive.

In another order published on the same day, the tax court denied St. Louis County's motion to dismiss one of Kmart's four petitions. *St. Louis County,* 2001 WL 40370 at *3. The court held that Kmart's failure to produce tenant-paid real estate expenses did not require dismissal under the 60–day rule.[8] *Id.* But the court provided no reasoning for this conclusion other than a citation to *Douglas County. Id.* The other eight decisions that Kmart cites were either decided after the expiration of the 60–day deadline following Kmart's filing of its 2002 petition,[9] or do not support the interpretation of the 60–day rule that Kmart proposes.[10]

---

sion, that is, applying it to all future cases but not to this case.

**8.** We are mindful that both *Douglas County* and *St. Louis County* involved Kmart leases similar or identical to the leases in this case.

**9.** *Kmart Corp. (Anoka) v. County of Anoka,* 2004 WL 612777; *Kmart Corp. (Blaine) v. County of Anoka,* 2004 WL 612789; *Kmart*

*Corp. (Columbia Heights) v. County of Anoka,* No. C3–01–2786.

**10.** *See FACS of New Ulm LLC v. County of Brown,* No. CX–00–222, 2001 WL 40352 at *1 (Minn. T.C. Jan. 11, 2001) (holding that petitioner provided a "significant amount of material related to income and expenses"); *Cypress Semiconductor v. County of Hennepin,* Nos. TC–27376, TC–27033, 1999 WL 1253032

■ Even if the conclusions stated in *Douglas County* and *St. Louis County* could be characterized as being "clearly established," we conclude that they do not qualify as the type of "precedent" on which litigants may rely for retroactivity purposes. Although the tax court is described as a "court," it is an administrative agency within the executive branch. *See Wulff v. Tax Court of Appeals*, 288 N.W.2d 221, 222–25 (Minn.1979) (distinguishing the tax court from judicial courts and upholding the constitutionality of the tax court statute, as against claimed violation of separation of powers, on the grounds that the taxpayer has the opportunity to elect to proceed in district court and because the tax court decisions are subject to judicial review of right in this court). As such, its decisions have little, if any, precedential effect. *See Sprint Spectrum LP v. Comm'r of Revenue*, 676 N.W.2d 656, 661 (Minn.2004) (characterizing decisions of the tax court as being "nonbinding when in conflict with decisions of this court"); *In re Whitehead*, 399 N.W.2d 226, 229 (Minn. App.1987) (recognizing that if a tax court's departure from a "previous practice" is

sufficiently supported by "reason or explanation," "an administrative agency is not bound to rigid adherence to precedent").[11]

The dissent relies on the two court of appeals decisions to support the proposition that there are some limits on the ability of an agency to depart from precedent, but those cases only require that there be a reasonable basis for any departure. The conclusion that precedent was based on an erroneous interpretation of a statute surely provides a reasonable basis to depart. Here, it is unclear whether the tax court is departing from *Douglas County* and *St. Louis County* because, as noted, the interpretation of the 60–day rule in those cases was not clear. But, to the extent the tax court did depart, it did so by correctly interpreting the 60–day rule, which provided a reasonable basis for departure and prevented its decision from being arbitrary or capricious.

■ We conclude that the decisions of the tax court do not qualify as precedent for purposes of retroactivity analysis. This conclusion is reinforced by the fact that the tax court serves as an alternative venue to the district court for chapter 278 petitions.[12] Decisions of district courts

at \*30 (Minn. T.C. Dec. 16, 1999) (holding that the 60–day rule did not apply to an owner-occupier because the property is not "income producing"); *Minn. Timberwolves Ltd. P'ship v. County of Hennepin*, Nos. TC–26329, TC–26856, 1999 WL 236600 at \*1 (Minn. T.C. April 20, 1999) (involving a request for a subpoena for a non-party witness, not a 60–day rule requirement); *Menards, Inc. v. County of Sherburne*, No. C2–98–460, 1998 WL 668734 at \*2 (Minn. T.C. Aug. 20, 1998) (holding owner occupied property not yet open for business with no rental income is not "income-producing property" within scope of the 60–day rule); *Aldrich S. Premises v. County of Dakota*, No. CX–95–7373, 1995 WL 516561 at \*1 (Minn. T.C. Aug. 24, 1995) (holding the owner's income and expense data was not "available" to a tenant who leased only 25% of the property).

11. For a brief discussion concerning the limited authority on the precedential nature of tax

court decisions, see Jerome A. Geis & Barry R. Greller, *The Minnesota Tax Court: The Taxpayer's Choice of Forum to Litigate a State Tax Liability*, 21 Hamline L.Rev. 407, 431 (1998) (noting that although not strictly bound by its own decisions, as a practical matter "the Tax Court follows its prior decisions unless provided with a good reason as to why the decisions are distinguishable or are no longer good law").

12. Taxpayers petitioning for review of property assessments can elect to file in the district court in the county where the tax was levied. Minn.Stat. § 278.01, subd. 1. The tax court was created to provide a speedier and more efficient *alternative* forum for this purpose, not a substitute forum with lawmaking authority. *See Land O'Lakes Dairy Co. v. Sebeka Village*, 225 Minn. 540, 547, 31 N.W.2d 660, 665 (1948).

likewise are not regarded as precedent for retroactivity purposes. *See In re Appeal of the Crow Wing County Att'y,* 552 N.W.2d 278, 280 n. 2 (Minn.App.1996). Because the tax court serves the same function as district courts in adjudicating property tax appeals, its decisions should not have greater precedential effect than decisions of the district court.

 Moreover, even if the doctrine of stare decisis were to apply to some orders of the tax court, it would not apply to orders "which are in conflict with the express provisions of statutory law." *Murphy Motor Freight Lines, Inc. v. Witte Transp. Co.,* 260 Minn. 440, 453, 110 N.W.2d 296, 305 (1961) (citing 2 Kenneth Culp Davis, *Administrative Law Treatise* § 17.07 (1st ed.1958)). As in *Sprint,* where we held that a tax court case is nonbinding if it directly contradicts a previous holding of this court, *see Sprint,* 676 N.W.2d at 661, a tax court case (like *Douglas County* and *St. Louis County* ) is nonbinding if it directly contradicts a statute. Thus, where the tax court incorrectly interprets a statute in one case, that interpretation does not override the statute in future cases. And, of course, decisions of the tax court have no binding effect on this court when we are ultimately called on to interpret a statute. *Care Inst., Inc.-Maplewood v. County of Ramsey,* 576 N.W.2d 734, 738 n. 4 (Minn.1998).

The dissent expands on Kmart's arguments by referring to the test for retroactivity of administrative agency decisions followed by a line of federal cases. These cases were not discussed by the parties, likely because they have no application to an administrative agency's interpretation of the plain meaning of a statute.

The dissent fails to distinguish between different types of administrative actions. Some administrative actions involve the agency's quasi-legislative power to make policy, including rules or regulations, with-

in the framework of an enabling statute. *See* Minn.Stat. § 14.05 (2004); *St. Paul Area Chamber of Commerce v. Minn. Pub. Serv. Comm'n;* 312 Minn. 250, 260–61, 251 N.W.2d 350, 357–58 (1977) (stating when an agency acts in a legislative capacity, "its decisions will be upheld [on judicial review] unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory [decisions] by clear and convincing evidence."). Other administrative actions involve the agency's quasi-judicial powers to adjudicate cases. Minn. Stat. § 14.58 (2004); *St. Paul Area Chamber of Commerce,* 312 Minn. at 259–61, 251 N.W.2d at 356, 358 (stating when an agency acts in a judicial capacity, its decision will be reviewed under the substantial-evidence standard).

The cases cited by the dissent in support of a prospective test do not involve a change in an agency's interpretation of a statute when made in its quasi-judicial capacity, but a change in the agency's interpretation or application of its own policies, rules or regulations, made in a quasi-legislative capacity. *E.g., Williams Natural Gas Co. v. Fed. Energy Regulatory Comm'n,* 3 F.3d 1544, 1546, 1552 (D.C.Cir. 1993) (addressing precedent permitting utilities to recover increases in natural gas costs under an automatic purchase gas adjustment policy devised by the agency); *Chang v. United States,* 327 F.3d 911, 915–16 (9th Cir.2003) (involving the retroactive application of amendments to rules promulgated by the agency); *Farmers Tel. Co. v. Fed. Communications Com'n,* 184 F.3d 1241, 1243 (10th Cir.1999) (reviewing agency's interpretation of its own regulations); *Laborers' Int'l Union of North America, AFL–CIO v. Foster Wheeler Corp.,* 26 F.3d 375, 385–86 (3d Cir.1994) (approving the retroactive application of an agency decision that reversed agency practices that were not dictated by statute). Obviously, agency decisions based on its

own policies, rules and regulations should have greater precedential effect, but even here an agency is not arbitrary or capricious when it reverses a past policy on a reasonable basis.

The only federal decision that appears to discuss this prospectivity test in the context of an agency's interpretation of a statute is *Microcomputer Technology Inst. v. Riley*, 139 F.3d 1044 (5th Cir.1998). The court began with two analyses to determine its scope of review:

> If the language of the statute plainly resolves the point, we of course must enforce it. * * * But if the statute is ambiguous, we must defer to "reasonable interpretations" made by the agency charged with administering it.

139 F.3d at 1047. The court then determined that although some parts of the agency decision were required by the plain language of the statute, other parts were left open by the statute and were within the policymaking authority of the agency. *Id.* at 1049. The court only addressed the issue of retroactivity in connection with the latter parts of the agency decision that involved agency policymaking. *Id.* at 1049–50.

As applied here, there is no claim that the legislature's enactment of the 60–day rule left open any question of policy for the tax court to decide. In fact, the tax court is not even charged with the exclusive administration of the 60–day rule. As noted, the tax court is only one adjudicative body that may hear claims under chapter 278, as an alternative to the district court.

Because we hold that the plain words of the 60–day rule require production of tenant-paid real estate expenses, we conclude that the federal prospectivity test does not apply to any changes the tax court may have made in its interpretation of the 60–

day rule concerning tenant-paid real estate expenses. Any other conclusion would enable an executive branch administrative agency to ignore or amend the plain language of a statute enacted by the legislature, in contravention of separation of powers.

For all these reasons we decline to extend the purely prospective ruling doctrine to decisions of the tax court.

## B. Equitable Estoppel

 We note that Kmart's argument presents some elements of equitable estoppel, although Kmart does not specifically refer to that doctrine. A governmental agency may be estopped from taking an enforcement action when the plaintiff demonstrates "[1] that the defendant, through his language or conduct, induced the plaintiff [2] to rely, in good faith, on this language or conduct [3] to his injury, detriment or prejudice." *See Ridgewood Dev. Co. v. State*, 294 N.W.2d 288, 292 (Minn. 1980) (numbering added). We have recognized that this doctrine can apply in cases where taxpayers rely on erroneous tax advice from the taxing authority. *Mesaba Aviation Div. of Halvorson of Duluth, Inc. v. County of Itasca*, 258 N.W.2d 877, 880 (Minn.1977).

 Although Kmart may have relied on the tax court decisions for taxes payable in 2001 and 2002,[13] it cannot satisfy its "heavy burden" under the first element. The *Ridgewood* court explained that this requires a showing not only of error on the part of the government, but of "wrongful conduct." *Ridgewood*, 294 N.W.2d at 293. This "wrongful conduct" element has since been interpreted to require some degree of malfeasance. *In re Westling Mfg., Inc.*, 442 N.W.2d at 328, 332 (Minn.App.1989); *see also Mesaba*, 258 N.W.2d at 880 (hold-

---

**13.** Because Kmart's 60–day rule submissions were identical for taxes payable in 2000, before any tax court decisions on the subject were filed, Kmart's reliance arguments are not strong.

ing that county officer's erroneous tax advice was not sufficiently "culpable"); *City of Eden Prairie v. Liepke*, 403 N.W.2d 252, 253, 256 (Minn.App.1987) (holding that defendant could argue the doctrine at his criminal trial, but only because the city approved of defendant's land use plans several times and then prosecuted him criminally for the very land use they approved). The tax court's good-faith interpretation of a statute, even if erroneous, would not rise to the level of malfeasance.

■ Further, equitable estoppel is generally applied only where the action giving rise to estoppel was taken by the administrative body that seeks to enforce a contrary rule. Here, Kmart does not claim to have relied on any actions of Stearns County, the taxing authority. Stearns County should not be estopped because of actions taken by the tax court.

The decision of the tax court is affirmed.

GILDEA, J., having not been a member of this court at the time of the argument and submission, took no part in the consideration or decision of these matters.

ANDERSON, PAUL H., Justice (concurring in part and dissenting in part).

I concur in part and dissent in part. I agree with the majority that Kmart must, under Minn.Stat. § 278.05, subd. 6(a) (2002), provide the information at issue in this case. But I take issue with the majority's characterization of how the Minnesota Tax Court must respect its own precedent,

and I disagree with the majority's decision to retrospectively apply our adoption of the tax court's new interpretation of Minn. Stat. § 278.05, subd. 6(a).

First, I write to clarify that an executive branch court such as the tax court, while not bound to follow its own precedent to the same degree as a judicial branch court, is still required to accord some respect to its own precedent. In its effort to make Kmart's reliance on tax court precedent appear unjustified, the majority presents only part of the story of the existing Minnesota case law on the issue of tax court precedent. For instance, the majority cites *In re Whitehead* for the proposition that Kmart's reliance on tax court decisions in previous Kmart cases was not reasonable, but on the contrary, *Whitehead* implies that some reliance on tax court decisions *is* justified, as "an agency may [not] abandon its own precedent without reason or explanation. * * * Failure to explain such a departure indicates that the agency's action is arbitrary and capricious." *In re Whitehead*, 399 N.W.2d 226, 229 (Minn.App.1987).[1] In fact, the court of appeals in *Whitehead* went on to conclude that the agency's action *was* arbitrary and capricious because the agency had departed from its own precedent without explanation. *Id.* at 229–30. The court in *Whitehead* even overturned the agency judgment on that basis. *Id.*

*Whitehead* is not the only case holding that an agency cannot change its precedent capriciously.[2] Minnesota case law on

---

**1.** Agency law applies to the tax court because, as we have previously held, the tax court is an administrative agency of the executive branch. *Great Lakes Gas Transmission L.P. v. Comm'r of Revenue*, 638 N.W.2d 435, 437 n. 5 (Minn.2002).

**2.** The majority cites one case, *Sprint Spectrum LP v. Comm'r of Revenue*, 676 N.W.2d 656 (Minn.2004), as characterizing a decision of the tax court as "nonbinding if it directly contradicts a previous holding of this court."

The majority uses *Sprint* to support its conclusion that reliance on tax court opinions is unreasonable. However, *any* lower court's opinion that directly contradicted an earlier opinion of our court would be "nonbinding." Yet reliance on a court of appeals opinion is reasonable except in the rare circumstance where the court of appeals opinion contradicts an opinion of our court (or, where applicable, the United States Supreme Court). I conclude that neither *Sprint* nor *Whitehead* supports the majority's conclusion that reli-

this issue indicates that while agencies like the tax court are not bound to respect their own precedent to the. same degree as a judicial court, neither can they cavalierly disregard their own precedent.[3] Moreover, federal case law overwhelmingly supports this position.[4]

I do not intend to imply that the tax court's new interpretation of Minn.Stat. § 278.05, subd. 6(a), is unreasonable, though I do believe that the tax court's failure to explain why it abruptly changed its position is violative of the general requirement laid down by federal courts and by our court of appeals that an agency must provide a "reasoned explanation" for a change of mind or position. *See, e.g., Stroe v. I.N.S.,* 256 F.3d 498, 503 (7th Cir.2001). My intention in discussing the precedential value of tax court decisions is to clarify what the precedential value is. I

am concerned that the majority may be downplaying the precedential value of tax court decisions in an effort to support its conclusion that Kmart's reliance on the two previous tax court decisions was unjustified.

I more definitively part company with the majority on the issue of retrospectivity. I conclude that we should follow the example of several federal courts in applying the prospective test formulated by the District of Columbia Circuit Court of Appeals for use in just this type of situation— when, due to an agency's abrupt shift of policy, justice would be better served by a prospective application of the agency's new interpretation of the law. *Williams Natural Gas Co. v. Fed. Energy Regulatory Comm'n,* 3 F.3d 1544, 1554 (D.C.Cir.1993). Here, the majority's decision to adopt the tax court's new interpretation of Minn.

---

ance on the tax court's previous Kmart opinions was unjustified.

**3.** *See, e.g., In re Detailing Criteria and Standards for Measuring an Elec. Util.'s Good Faith Efforts in Meeting Renewable Energy Objectives under Minn.Stat. 216B.1691,* 700 N.W.2d 533, 539 (Minn.App.2005) ("[A]lthough an agency is not bound to follow its past decisions, it must provide a reasonable basis for departure from precedent"); *Peoples Natural Gas Co., a Div. of InterNorth, Inc. v. Minn. Pub. Utils. Comm'n,* 342 N.W.2d 348, 352–53 (Minn.App.1983) (quoting *McHenry v. Bond,* 668 F.2d 1185 (11th Cir.1982)) (stating that an agency may, not abandon its own precedent without reason or explanation).

**4.** *See, e.g., N.Y. Pub. Interest Research Group, Inc. v. Johnson,* 427 F.3d 172, 182 (2d Cir. 2005) (quoting *Ramaprakash v. Fed. Aviation Admin.,* 346 F.3d 1121, 1124 (D.C.Cir.2003)) ("Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.' "); *Borough of Columbia v. Surface Transp. Bd.,* 342 F.3d 222, 229 (3d Cir.2003) ("If an agency departs from its own precedent without a reasoned

explanation, the agency may be said to have acted arbitrarily and capriciously."); *Ramaprakash v. Fed. Aviation Admin.,* 346 F.3d 1121, 1124 (D.C.Cir.2003) ("[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation."); *Osei v. I.N.S.,* 305 F.3d 1205, 1210 (10th Cir.2002) ("[T]he agency cannot, as a legislature can, reverse course without any explanation; its about-faces must be reasoned."); *Harrington v. Chao,* 280 F.3d 50, 58 (1st Cir. 2002) ("An agency's decision cannot simply depart from the agency's prior precedent without explaining its reasons for doing so."); *Stroe v. I.N.S.,* 256 F.3d 498, 503 (7th Cir. 2001) (requiring an agency contradicting its precedent to provide "a reasoned explanation for its change of mind"); *Diaz–Resendez v. I.N.S.,* 960 F.2d 493, 495 (5th Cir.1992) (agency determinations may be .overturned if they "inexplicably [depart] from established policies"); *Brock v. Dun–Par Engineered Form Co.,* 843 F.2d 1135, 1137–38 (8th Cir.1988) (stating that "while [the agency] may change its position, it must give adequate reasons for doing so"); *Michigan v. Thomas,* 805 F.2d 176, 184 (6th Cir.1986) ("An administrative agency may reexamine its prior decisions and may depart from its precedents provided the departure is explicitly and rationally justified.").

Stat. § 278.05, subd. 6(a), retrospectively harms innocent taxpayers who legitimately relied on a tax court precedent. Even more seriously, the majority's apparent conclusion that the tax court need not follow its own precedents and that prospective application of our adoption of the tax court's new interpretation of the law is not available leaves taxpayers in a no-man's-land of uncertainty—taxpayers may be penalized by the tax court for not following tax court precedent, or, if they follow those precedents, they may be punished by our court for doing so.

The D.C. Circuit Court has held that when an agency shifts its interpretation, fairness may require that the new rule should be applied prospectively to those subject to the new interpretation. *Williams Natural Gas Co.*, 3 F.3d at 1554. The D.C. Circuit Court applies a five-factor test to determine whether prospective application is appropriate:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.; see also Chang v. United States*, 327 F.3d 911, 928 (9th Cir.2003); *Farmers Tel. Co. v. F.C.C.*, 184 F.3d 1241, 1251 (10th Cir.1999); *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 392 (3d Cir.1994).

In the case before us today, fairness requires that we apply a rule similar to the rule articulated by the D.C. Circuit Court. Here, the tax court disregarded its prior holding without explanation or excuse for its shift in position.[5] The court simply articulated an interpretation of Minn.Stat. § 278.05, subd. 6(a), which is directly contrary to that which it had previously given in two related Kmart tax cases. *See Kmart Corp. v. County of Douglas*, No. C7-00-309, 2001 WL 40361 (Minn. T.C. Jan. 11, 2001); *Kmart Corp. v. County of St. Louis*, Nos. C1-00-600670, CX-00-600666, C3-00-600671, C8-00-600665, 2001 WL 40370 (Minn. T.C. Jan. 11, 2001). This sudden shift in position makes the federal prospective application doctrine relevant. Moreover, the inequity of the majority's result is another reason why application of the federal prospective doctrine is appropriate. Today's outcome is simply unjust to the taxpayer. The tax court told Kmart at least twice in related previous Kmart cases that a tenant taxpayer need not produce the extra information at issue here. *Kmart Corp. v. County of Douglas*, 2001 WL 40361 at *2; *Kmart Corp. v. County of St. Louis*, 2001 WL 40370 at *3. And as the case law shows, despite the majority's assertion, some reliance on the holdings of the tax court is natural and justifiable.[6]

When we apply the D.C. Circuit Court's prospective application doctrine to this case, all five factors tilt in favor of prospective application, or at least in favor of allowing Kmart to submit the additional information. First, this case is one of first impression. Second, the new interpretation of the statute represents an abrupt departure from two prior tax court cases—given

---

**5.** The tax court did mention the previous tax court cases, but holds that they were decided on other grounds. It fails to address and discuss what the majority openly admits—that its holdings included a statement that Kmart need not produce the information required here.

**6.** *See supra* notes 3–4 and accompanying text.

in the course of very similar cases with the same petitioner. Third, Kmart relied completely on the former rule. Fourth, Kmart will be irremediably burdened by retrospective application of the rule because its appeal will be dismissed based on its violation of the 60–day rule. Fifth, the statutory interest in applying the 60–day rule in this instance is slight because allowing Kmart to offer the required additional information now would not significantly prejudice the state. A prospective application of the new interpretation of the law would simply require the tax court to allow Kmart's petition to proceed, as tax cases do every day.

The majority rejects this highly relevant federal doctrine, stating that the cases within which the doctrine has been applied have been cases in which the agencies have been involved in interpretation of their own rules or policies, not interpretation of a statute.[7] However, in regard to the federal prospective application doctrine, I view this as a meaningless distinction (and indeed, the majority does not attempt to explain why the difference would be important here). The federal prospective application doctrine was created to alleviate an injustice—to give relief to those citizens who reasonably relied on an agency's prior determination of the law. The injustice of repeatedly telling a petitioner that it need not produce certain information, then

abruptly turning the tables on that petitioner, remains regardless of whether the injustice is the result of the interpretation of a rule or a statute. Additionally, an agency's interpretation of its own rule may be overturned by our court just as the agency's interpretation of the statute it administers may be; and a taxpayer must respect both the agency's rule and statutory interpretation until such interpretation is overturned by our court. *St. Otto's Home v. Minn. Dept. of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989). A taxpayer's reliance on the tax court's interpretation of a statute is therefore no less reasonable than the taxpayer's reliance on the tax court's interpretation of a rule. The outcome of this case is simply unfair, regardless of whether the taxpayer relied on the tax court's interpretation of a statute, a rule, or an agency policy.

Instead of applying the federal prospective application doctrine, the majority applies our purely prospective doctrine, which is generally confined to addressing changes in court case law, not agency case law. In support of its holding, the majority tries to make Kmart's reliance on two directly applicable tax court opinions appear to be unjustified.[8] But as noted above, Minnesota and federal case law indicate that agencies cannot overturn their prior judgments on a whim. Some reliance by Kmart is therefore justified.[9]

7. Importantly, there is no evidence cited by the majority that the federal courts would not apply the federal prospective application doctrine to cases wherein an agency consistently interpreted a statute in one way, then abruptly shifted its interpretation. It may be that such a case simply has not yet come before the federal courts of appeals.

8. The majority also overlooks the pertinent fact that the tax court rulings here were issued in two prior Kmart cases which are part of a series of Kmart cases. This case is also one of that series. The fact that these cases are all, in a sense, linked and are taking place at roughly the same time and with the same

petitioner makes it more reasonable for Kmart to have relied upon the rulings of the tax court in the prior cases. For additional tax court cases in this series, which were decided after the expiration of the 60–day deadline following Kmart's filing of its 2002 petition, see footnote no. 9 of the majority opinion.

9. The majority further mentions that the tax court is not bound by its prior decisions if those prior decisions are in conflict with the express provisions of statutory law. But the issue here is not whether the tax court is forever bound to uphold a prior incorrect ruling; even this court may overturn its own

More to the point, common sense indicates that reliance was justified and should have been expected. The tax court told Kmart twice, in cases just previous to this one, that it did not need to produce the information at issue here. Now Kmart is told that not only does it need to produce the information, but that its failure to do so earlier necessarily results in dismissal of its petition. The majority's technical analysis of the purely prospective doctrine ignores the heart and basis of the doctrine, which is that, sometimes, the retrospective application of a new rule results in great injustice. *See Spanel v. Mounds View Sch. Dist. No. 621*, 264 Minn. 279, 294, 118 N.W.2d 795, 804, (1962).

While I believe that this case does satisfy the purely prospective doctrine because Kmart's reliance was natural and reasonable, I also believe that this is exactly the type of case for which the federal courts have fashioned their prospective application doctrine. The federal prospective application doctrine was created to deal with the injustice that occurs when agencies abruptly change their interpretation of a law or rule upon which a person or entity had reasonably relied. With such doctrines available to us, there is no reason why we should permit this and future similar injustices to occur. Therefore, I would hold that our adoption of the tax court's new interpretation of Minn.Stat. § 278.05, subd. 6(a), should be applied prospectively.

prior holding that it discovers to be incorrect. The issue is whether the taxpayer is justified in relying on the holdings of the tax court. To say that a citizen was not justified in relying upon an opinion of a court simply because that opinion was later overturned would obviate the purely prospective ruling doctrine entirely.